# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**WILLIAM CALVIN BETHEL, JR.**                                          **PLAINTIFF**

**V.**                                **CASE NO. 5:18-cv-05116**

**DR. ROBERT KARAS and**
**SHERIFF TIM HELDER**                                          **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This is a civil rights action filed by Plaintiff William C. Bethel, Jr., pursuant to 42 U.S.C. § 1983.  Bethel proceeds *pro se* and *in forma pauperis*.

The claims in this case concern the medical care Bethel received when he was incarcerated in the Washington County Detention Center ("WCDC") from July 11, 2017, until his transfer to the Arkansas Department of Correction on October 19, 2017. Specifically, Bethel maintains that Dr. Robert Karas, the contract physician for the WCDC, and Sheriff Tim Helder violated Bethel's constitutional rights by denying him adequate medical care.

On December 19, 2018, Defendants filed a Motion for Summary Judgment (Doc. 21).  On December 27, 2018, an Order was entered directing Bethel to file a response to the Motion for Summary Judgment by January 17, 2019.  (Doc. 24).  Bethel was advised in the Order that failure to comply with its terms would result in:  (a) all of the facts set forth by the Defendants in the summary judgment papers being deemed admitted by Bethel, pursuant to Rule 56.1(c) of the Local Rules for the Eastern and Western Districts of Arkansas; and/or (b) the dismissal of the entire case, without prejudice, pursuant to Local Rule 5.5(c)(2).  Bethel did not file a response to the summary judgment motion.

Although the local rules allow the Court to deem facts admitted when a plaintiff does not file a response specifically disputing those facts, the Eighth Circuit has stated:

> A plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment, and a complaint signed and dated as true under penalty of perjury satisfies the requirement of a verified complaint, 28 U.S.C. § 1746. Although a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion.

*Roberson v. Hayti Police Dep't.*, 241 F.3d 992, 994-995 (8th Cir. 2001). Therefore, the Court will "piece[] together [Bethel's] version of the facts from the verified complaint." *McClanahan v. Young*, 2016 WL 520983, at *1 (D.S.D. Feb. 5, 2016). The Court also has the benefit of Bethel's deposition, which is attached to the motion. Accordingly, the Court will deem admitted those portions of the Defendants' statement of material facts that do not conflict with either Bethel's verified complaint or his deposition.

## I. BACKGROUND

### A. Bethel's Account of His Medical History

Bethel testified that he was diagnosed in 2015 with severe chronic obstructive pulmonary disease ("COPD") and sleep apnea by Dr. Kalyan of Northwest Physicians. (Doc. 23-6 at 25, 27). Dr. Kalyan prescribed oxygen, twenty-four hours a day and seven days a week; the use of a CPAP/BIPAP[1] machine; Prednisone[2] as needed; two inhalers

---

[1] CPAP stands for Continuous Positive Airway Pressure. BIPAP stands for Biphasic Positive Airway Pressure.

[2] "Prednisone is used alone or with other medications to treat the symptoms of low corticosteroid levels (lack of certain substances that are usually produced by the body and are needed for normal body functioning). Prednisone is also used to treat other

(Symbicort and Coventolin); an Albuterol updraft machine; and an Albuterol inhaler.[3] *Id.* at 25, 27, 32-33. Bethel stated that he did not use the oxygen as directed because he was worried he would become dependent on oxygen. *Id.* at 25. When Bethel's deposition was taken on November 12, 2018, he testified that he only used oxygen on an as-needed basis, which he estimated was now more than 50% of the time. *Id.* at 26. He indicated that he possessed a portable oxygen bottle in a carrying case with a nasal cannula. *Id.* Bethel also testified that he used the CPAP/BIPAP machine when he slept. *Id.* at 27. He admitted that there were periods of time in his life when he could not afford to lease the CPAP machine. *Id.* at 27-28. Further, despite his COPD diagnosis, Bethel testified that he still smoked about a pack of cigarettes a day. *Id.* at 49.

At some point, Bethel was diagnosed with a blood clot (a deep vein thrombosis ("DVT")) in his right leg and was placed on Coumadin.[4] *Id.* He claims that Dr. Hayward

---

conditions in patients with normal corticosteroid levels. These conditions include certain types of arthritis; severe allergic reactions; multiple sclerosis (a disease in which the nerves do not function properly); lupus (a disease in which the body attacks many of its own organs); and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines."
https://medlineplus.gov/druginfo/meds/a601102.html (accessed April 23, 2019).

[3] Bethel testified that an updraft is a machine in which you put a liquid medication and then you inhale until the liquid is gone. (Doc. 23-6 at 34). Typically, this process takes twenty minutes. *Id.*at 37. He currently uses updrafts four times a day and the Albuterol inhaler about every hour and a half. *Id.* at 36-37. He uses the steroid inhaler about twice a day. *Id.*

[4] Coumadin is a brand name for Warfarin. "Warfarin is used to prevent blood clots from forming or growing larger in your blood and blood vessels. It is prescribed for people with certain types of irregular heartbeat, people with prosthetic (replacement or mechanical) heart valves, and people who have suffered a heart attack. Warfarin is also used to treat or prevent venous thrombosis (swelling and blood clot in a vein) and pulmonary embolism (a blood clot in the lung)."
https://medlineplus.gov/druginfo/meds/a682277.html (accessed April 21, 2019).

of Highlands Oncology took him off Coumadin due to an adverse reaction and prescribed Lovenox[5] injections instead. Bethel testified that he currently gives himself Lovenox injections in the stomach. *Id.* at 38-39. He maintains that in 2017, he was also diagnosed as having pulmonary embolisms in his lungs, specifically three or four blood clots. *Id.* at 38, 41.

Next, Bethel claims that he was diagnosed with pulmonary hypertension in 2010. This condition was not treated. *Id.* at 43. He testified that his bicuspid valve and his mitral valve have moderate leakage. *Id.* at 43-44. He further claims that he was diagnosed with hypertension at some point in time, and doctors treated that condition with blood pressure medication. *Id.* at 43.

Next, Bethel claimed to have "borderline diabetes," which he claims to monitor himself by testing his sugar levels daily. He also testified that he has neuropathy[6] in his

---

[5] Lovenox is a brand name for an enoxaparin injection. "Enoxaparin is used to prevent blood clots in the leg in patients who are on bedrest or who are having hip replacement, knee replacement, or stomach surgery. It is used in combination with aspirin to prevent complications from angina (chest pain) and heart attacks. It is also used in combination with warfarin to treat blood clots in the leg." https://medlineplus.gov/druginfo/meds/a601210.html (accessed April 21, 2019).

[6] Neuropathy is defined as a term for: "any disorder affecting any segment of the nervous system." https://www.medilexicon.com/dictionary/60187 (accessed April 23, 2019).

legs and hands and at one point was prescribed "nerve medication," *i.e.,* Gabapentin[7] or Klonopin. [8]  *Id.* at 44-45.

Finally, with respect to his mental health, Bethel claims he has severe anxiety, depression, and bipolar disorder.  He believes he was diagnosed with bipolar disorder by Dr. Bonner in 2016.  *Id.*  Bethel was also prescribed Adderall[9] for ADD/ADHD. [10]  *Id.* at 50.

When Bethel was arrested in July of 2017, he claims he was taking Hydrocodone[11] for the neuropathy in his legs and for arthritis in his elbows, wrists, and knees.  *Id.* at 51. Several months before his arrest, in March of 2017, he was incarcerated in the WCDC for a few days was prescribed the following medications:   Albuterol; Gabapentin;

---

[7] "Gabapentin capsules, tablets, and oral solution are used to help control certain types of seizures in people who have epilepsy. Gabapentin capsules, tablets, and oral solution are also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). Gabapentin extended-release tablets (Horizant) are used to treat restless legs syndrome."
https://medlineplus.gov/druginfo/meds/a694007.html (accessed April 21, 2019).

[8] Klonopin is a brand name for the drug Clonazepam.  "Clonazepam is used alone or in combination with other medications to control certain types of seizures. It is also used to relieve panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)." https://medlineplus.gov/druginfo/meds/a682279.html (accessed April 21, 2019).

[9] Adderall is a brand name for a combination product containing Amphetamine and Dextroamphetamine.  It is used as part of a treatment program to control the symptoms of ADD/ADHD.
https://medlineplus.gov/druginfo/meds/a601234.html (accessed April 23, 2019).

[10] Attention-Deficit Disorder (ADD).  Attention-Deficit Hyperactivity Disorder (ADHD).

[11] "Hydrocodone is used to relieve severe pain. Hydrocodone is only used to treat people who are expected to need medication to relieve severe pain around-the-clock for a long time and who cannot be treated with other medications or treatments." https://medlineplus.gov/druginfo/meds/a614045.html (accessed April 23, 2019).

Metoprolol; Amlodipine; Lisinopril; Lipitor;[12] Furosemide; Enoxaparin Sodium; a steroid inhaler; and Potassium.  (Doc. 23-4 at 143).

## B. Bethel's Documented Booking and Medical History

Bethel was booked into the WCDC in the late evening hours on July 11, 2017. (Doc. 23-2 at 1).  His intake papers indicate that he was in possession of the following: Amphetamine salt;[13] Lovenox; Lisinopril;[14] Amlodipine;[15] Albuterol inhaler; Hydrocodone; Adderall; and a steroid inhaler.[16]  *Id.* at 2.  Bethel reported to the intake officer that he had a history of heart and breathing problems.  *Id.*  A nurse came to the booking area and asked where Bethel's medical records could be obtained.  (Doc. 23-6 at 56).  Bethel testified that he advised the nurse that the WCDC could obtain his medical records from Drs. Bonner, Howard, Kalyan, and Fish.  *Id.* at 56-57.

---

[12] Lipitor is a brand name for the drug Atorvastatin.  "Atorvastatin is used together with diet, weight loss, and exercise to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease. Atorvastatin is also used to decrease the amount of fatty substances such as low-density lipoprotein (LDL) cholesterol ('bad cholesterol') and triglycerides in the blood and to increase the amount of high-density lipoprotein (HDL) cholesterol ('good cholesterol') in the blood." https://medlineplus.gov/druginfo/meds/a600045.html (accessed April 21, 2019).

[13] Another name for the combination or drugs used in Adderall.

[14] "Lisinopril is used alone or in combination with other medications to treat high blood pressure. It is used in combination with other medications to treat heart failure. Lisinopril is also used to improve survival after a heart attack." https://medlineplus.gov/druginfo/meds/a692051.html (accessed April 23, 2019).

[15] "Amlodipine is used alone or in combination with other medications to treat high blood pressure and chest pain (angina)." https://medlineplus.gov/druginfo/meds/a692044.html (accessed April 23, 2019).

[16] However, there is a contradictory note in the medical records indicating that the only medication in Bethel's property was Adderall.  (Doc. 23-4 at 96).

On July 13, 2017, the WCDC received medical records for Bethel from Mission Family Practice. These records showed that Bethel had a history of COPD, ADD/ADHD, generalized anxiety disorder, depression, and personality disorder. (Doc. 23-4 at 8-13). His prescribed medications included Adderall, Combivent[17], Hydrocodone, Klonopin, Lasix,[18] Lipitor, Lisinopril, Lovenox (subcutaneous injection), Norvasc, Potassium Chloride, Prednisone, ted hose for daily wear, Trazodone,[19] Tussionex,[20] Ventolin (inhaler), and Wellbutrin. [21]

_____

[17] Combivent is a combination product containing Albuterol and Ipratropium. "The combination of albuterol and ipratropium is used to prevent wheezing, difficulty breathing, chest tightness, and coughing in people with chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways) such as chronic bronchitis (swelling of the air passages that lead to the lungs) and emphysema (damage to the air sacs in the lungs)."
 https://medlineplus.gov/druginfo/meds/a601063.html (accessed April 21, 2019).

[18] Lasix is the brand name for the drug Furosemide. "Furosemide is used alone or in combination with other medications to treat high blood pressure. Furosemide is used to treat edema (fluid retention; excess fluid held in body tissues) caused by various medical problems, including heart, kidney, and liver disease."
https://medlineplus.gov/druginfo/meds/a682858.html (accessed April 21, 2019).

[19] "Trazodone is used to treat depression. . . . Trazodone is also sometimes used to treat insomnia and schizophrenia . . . [and] anxiety."
https://medlineplus.gov/druginfo/meds/a681038.html (accessed April 21, 2019).

[20] Tussionex is a brand name for a product containing Chlorpheniramine and Hydrocodone. "Some hydrocodone combination products are used to relieve moderate-to-severe pain. Other hydrocodone combination products are used to relieve cough." https://medlineplus.gov/druginfo/meds/a601006.html (accessed April 21, 2019).

[21] Wellbutrin is the brand name for the drug Bupropion. "Bupropion (Aplenzin, Wellbutrin, Wellbutrin SR, Wellbutrin XL) is used to treat depression." Bupropion (Aplenzin, Wellbutrin XL) is also used to treat seasonal affective disorder (SAD; episodes of depression that occur at the same time each year [usually in the fall and winter but rarely may occur in the spring or summer months])." https://medlineplus.gov/druginfo/meds/a695033.html (accessed April 21, 2019).

On July 19, 2017, the WCDC received Bethel's records from Northwest Health System. He had been treated there for the following conditions: a minor finger laceration on July 12, 2015, *id.* at 17-27; and cellulitis following a hernia repair on November 25, 2015, *id.* at 28-38.

On July 19, 2017, the WCDC received Bethel's records from Highlands Oncology. From these records, it appears that on December 15, 2016, Bethel was diagnosed with acute embolism and thrombosis of an unspecified vein, anxiety disorder, polyneuropathy, other pulmonary embolism, bipolar disorder, COPD, pain in the right lower leg, personality disorder, major depressive disorder, and ADHD. *Id.* at 61. Bethel was switched from the drug Coumadin to the drug Xarelto, for treatment of his deep vein thrombosis condition.[22] *Id.* The medical records noted that Bethel had a "very complicated history involving primarily lungs and now a question of pulmonary emboli." *Id.* at 63.

Bethel was next seen by Highlands Oncology on December 28, 2016, complaining of rectal bleeding following initiation of Xarelto. *Id.* at 56. Bethel refused to consider having a colonoscopy but agreed to see a gastroenterologist. *Id.* A note was made in his file that Bethel's father had died of breast cancer at the age of 42. *Id.* at 57. Bethel was told to stop taking Coumadin and Xarelto and was given a prescription for Lovenox. *Id.* at 59.

---

[22] Xarelto is a brand name for Rivaroxaban. "Rivaroxaban is used to treat deep vein thrombosis (DVT; a blood clot, usually in the leg) and pulmonary embolism (PE; a blood clot in the lung). Rivaroxaban may be continued to prevent DVT and/or PE from happening again after initial treatment is completed."
https://medlineplus.gov/druginfo/meds/a611049.html (accessed April 21, 2019).

He was also seen at Highlands Oncology on May 11, 2017, just two months before his July incarceration at the WCDC. On May 11, he complained of pain in his legs, knees, and hips; fatigue; daily diarrhea; and restless sleep. His chart noted that he had several clots in the right lower lobe of his lung, chronic swelling of his right lower extremity, and possible pulmonary emboli. *Id.* at 41, 43. He was on "oxygen chronically" and took Prednisone 10 mg daily, a Ventolin inhaler, Warfarin,[23] Norvasc,[24] Potassium Chloride, and Combivent. *Id.* at 41. It was also noted that he had "diagnoses of a major depressive, personality disorder and attention deficient disorder" for which he took Klonopin and Adderall. *Id.* Dr. Hayward prescribed Lovenox injections and noted that the following medications had previously been prescribed to Bethel: Accu-Check Compact Test, Adderall, Chantix, Combivent Respimat solution for inhalation, Doxepin[25], Hydrocodone,

---

[23] Coumadin.

[24] Amlodipine.

[25] "Doxepin is used to treat depression and anxiety."
https://medlineplus.gov/druginfo/meds/a682390.html (accessed April 23, 2019).

Klonopin, Lasix, Lipitor, Lisinopril, Lopressor[26], Lunesta[27], Lyrica[28], Maxzide[29], Norvasc, Potassium Chloride, Symbicort inhaler, Tramadol[30], Trazodone, Ventolin inhaler, and Xarelto. *Id.* at 41-43.

## C. Medical Treatment at the WCDC

Since January 1, 2016, Dr. Karas has been the WCDC's doctor for all inmates, and Karas Correctional Health has provided all medical, dental, and mental health care coordination for inmates in the WCDC. "All matters of judgment regarding health services

---

[26] Lopressor is a brand name for the drug Metoprolol. "Metoprolol is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and to improve survival after a heart attack." https://medlineplus.gov/druginfo/meds/a682864.html (accessed April 23, 2019).

[27] Lunesta is a brand name for the drug Eszopiclone. "Eszopiclone is used to treat insomnia (difficulty falling asleep or staying asleep). Eszopiclone is in a class of medications called hypnotics. It works by slowing activity in the brain to allow sleep." https://medlineplus.gov/druginfo/meds/a605009.html (accessed April 23, 2019).

[28] Lyrica is a brand name for the drug Pregabalin. "Pregabalin capsules, oral solution (liquid), and extended-release (long-acting) tablets are used to relieve neuropathic pain (pain from damaged nerves) that can occur in your arms, hands, fingers, legs, feet, or toes if you have diabetes and postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). Pregabalin capsules and oral solution are also used to relieve neuropathic pain that can occur after a spinal cord injury and to treat fibromyalgia (a long-lasting condition that may cause pain, muscle stiffness and tenderness, tiredness, and difficulty falling asleep or staying asleep)." https://medlineplus.gov/druginfo/meds/a605045.html (accessed April 23, 2019).

[29] Maxzide is a brand name for a combination of Triamterene and Hydrochlorothiazide. "The combination of triamterene and hydrochlorothiazide is used to treat high blood pressure and edema (fluid retention; excess fluid held in body tissues) in patients who have lower amounts of potassium in their bodies or for whom low potassium levels in the body could be dangerous." https://medlineplus.gov/druginfo/meds/a601125.html (accessed April 23, 2019).

[30] "Tramadol is used to relieve moderate to moderately severe pain." https://medlineplus.gov/druginfo/meds/a695011.html (accessed April 23, 2019).

are made within the sole province of the contract medical staff. No employee of the [WCDC] is permitted to make non-emergency medical decisions on behalf of any inmate." (Doc. 23-1 at 3).

Detainees are required to submit all non-emergency medical requests through an electronic kiosk. Medical staff then review the medical requests that the inmates submit. The nursing staff is responsible for checking the files of inmates under care and for following all physician's orders that are noted in the file. According to Dr. Karas's Affidavit:

> No one in the Sheriff's office, **_including the Sheriff_**, makes any decision as to whether or not [to] provide a particular medication, diagnostic testing, or medical treatment based on the cost of the medication, testing, or treatment. All decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the providers at the detention facility.

(Doc. 23-7 at 1-2) (emphasis in original).

The WCDC has adopted procedures for handling inmates who are prescribed medications while in the facility and who are admitted with medications on their persons. According to Dr. Karas, "[i]t is common practice of the WCDC medical staff to request a patient's medical records prior to prescribing medications." *Id.* at 2.

On July 11, 2017, the day of Bethel's arrest, Corporal Patrick Bzoski submitted an incident report which read as follows:

> On July 11, 2017 at approximately 10:57 p.m., Officer Hayden from the Fayetteville Police Department Brought in Detainee Bethel, William . . . for false imprisonment. Prior to their arrival they were at the hospital because Detainee Bethel complained he was having a heart attack. The hospital medically cleared him and then Detainee Bethel made the statement that he wanted to kill himself. Once the intake was complete, Officer Hayden informed me of Detainee Bethel's statement.

> I notified the medical staff and Nurse Melissa responded. She spoke with Detainee Bethel and asked him if he wanted to commit suicide and he responded no. Nurse Melissa had Detainee Bethel sign a "No Harm

11

Contract" and concluded from her evaluation [that] Detainee Bethel did not need to be put on suicide watch.

(Doc. 23-5 at 1).

On July 12, 2017, medical staff reviewed Bethel's current medications and performed a medication reconciliation. (Doc. 23-4 at 89). They were able to verify his prescriptions for Hydrocodone, Tramadol, and Adderall at the Southgate Pharmacy. It appeared to staff that Bethel had not filled his prescriptions at the Southgate Pharmacy for Wellbutrin, Clonazepam,[31] Lipitor, Ventolin inhaler, Furosemide,[32] Triamterene-HCTZ,[33] Warfarin, Metoprolol,[34] Amlodipine, Gabapentin, Atorvastatin,[35] or Lisinopril for some time, and he had no refills left on any of those prescriptions. *Id.* at 90-93. In short, Dr. Karas and his staff concluded that Bethel had not been taking many, if any, of his heart medications and blood thinners since sometime in 2016. (Doc. 23-7 at 3). However, records from Bethel's March 2017 incarceration at the WCDC showed that he was prescribed at least Lovenox—a drug used to treat and prevent blood clots—during that several-day window. In fact, according to documents submitted by the Defendants,

---

[31] Klonopin.

[32] Lasix.

[33] **Triamterene and Hydrochlorothiazide.** "The combination of triamterene and hydrochlorothiazide is used to treat high blood pressure and edema (fluid retention; excess fluid held in body tissues) in patients who have lower amounts of potassium in their bodies or for whom low potassium levels in the body could be dangerous." https://medlineplus.gov/druginfo/meds/a601125.html (accessed April 21, 2019).

[34] Lopressor.

[35] Lipitor.

March 14, 2017 "was the last confirmed record of Lovenox administration" at the jail facility. *Id.* at 4.

Shortly after Dr. Karas received some of Bethel's medical records from his free-world providers, he ordered Bethel to begin taking aspirin (162 mg.) on July 19, 2017, to serve as a blood thinner. (Doc. 23-4 at 98). Dr. Karas had concerns about the lack of detail in the medical records that would explain or justify why certain anticoagulant medications had been prescribed. He stated in his affidavit:

> The records from Dr. Bonner did not give a thorough history of Bethel's diagnoses, and did not detail why he was taking the Lovenox. Further information was request[ed] from Walker Heart, who stated that the patiend [sic] had not been there since 2015 . . . . Medical records were received from Northwest medical Center on 7/19/16 and reviewed the same day. These records did not contain any information regarding anticoagulant medications.

(Doc. 23-7 at 3-4). In the meantime, Bethel refused to take the aspirin, and the prescription was discontinued on July 26, 2017. *Id.* at 99. Bethel later testified that he refused to take aspirin because he knew it would not help his medical conditions. (Doc. 23-6 at 59

On July 20, 2017, Bethel submitted a medical request complaining that he was being charged for medical services, but none had been provided to him. On July 24, 2017, Bethel again asked for his money back because no medical services had been rendered. Nurse Hughes responded that Bethel "has more medical personnel trying to get all your medical history than most people." (Doc. 23-6 at 65). She noted that he had listed very serious medications in his history, and staff were trying to get his medications started. She also noted that they had been "unable to verify" Bethel's medications and asked if he had "the bottles we can use them to get yours filled. Can you have them

13

brought to us?"  *Id.*  Bethel testified that his bottles were brought to the jail as requested. Bethel indicated he did not receive the medications even after this was done.  *Id.*

On July 29, 2017, Bethel submitted a grievance stating that he was not being given his medication, "which is life-threatening medicine, which violates [his] inmate rights." (Doc. 23-6 at 62).  The nurse responded by asking if he wanted to sign a medical refusal form since he had refused the treatment they had tried—the treatment being aspirin, presumably.  *Id.*  Bethel responded by asking that staff contact his attorney, as he could not speak about "this matter."  *Id.*  Bethel testified he responded this way because medical staff had made no effort to obtain his medications.  *Id.* at 63.  He felt that he would have to let his attorney handle his medical issues.  *Id.*

On August 6, 2017, Bethel complained to medical personnel that he needed help gathering his thoughts.  He explained that he had been on Adderall and Klonopin in the free world.  (Doc. 23-4 at 99).  He was added to the "Psych Call" list in response to his complaint.  *Id.*  Nurse Shelia Bryant examined Bethel on August 8, 2017, and she indicated she would confer with Bethel's "psych" doctor, Dr. Wallace, about his prescriptions.  *Id.*  On August 9, 2017, prescriptions were added to Bethel's WCDC medication list for the drugs Lithium and Zyprexa.  *Id.* at 99-100.

On August 10, 2017, Bethel asked in a written grievance why he had been charged $10 twice.  He noted that he had only been seen once by a nurse and hoped he was not being charged every time he took their pills.  In response, he was told he had been charged for prescriptions for Lithium and Zyprexa.

On August 17, 2017, Bethel complained that the Lithium was not working. Nurse Lahman responded in writing that he had been started on Lithium and Zyprexa on August 9th and that it could take four to six weeks for antidepressants to reach therapeutic levels.

On August 17, 2017, Bethel complained that he was highly allergic to strawberries and yet received strawberry cake on his tray once a week. (Doc. 23-4 at 101). In response, he was told to feel free not to eat the cake. *Id.* Bethel responded that the tray was contaminated once the strawberry cake was put on it. *Id.* at 102. Bethel also noted that his medical records would show that he stopped breathing when he ate a strawberry. *Id.* A diet change was ordered the following day that specified Bethel was allergic to strawberries. *Id.*

On August 25, 2017, Bethel asked if his medical care was based on his records from his free-world doctors. (Doc. 23-4 at 104-05). Bethel noted that he had serious medical conditions and asked if the WCDC had received his records from Dr. Bonner. *Id.* at 104. Bethel claimed he had been at the facility for a month and a half and had received "very little medical assistance." *Id.* at 105. Bethel was informed that records had been received from Dr. Bonner, Highlands Oncology, and Northwest Medical Center. *Id.* Bethel was then asked in writing if there was somewhere else he would like the medical staff to try to obtain further information. *Id.*

On August 26, 2017, Bethel submitted another grievance, this time asking to be prescribed medications relevant to his pulmonary issues and access to his CPAP machine. (Doc. 23-4 at 104). Bethel testified later that when he did not have his CPAP machine, he would wake up "feeling like [he] was suffocating in [his] sleep." (Doc. 23-6 at 67).

On August 29, 2017, Bethel's prescriptions for Lithium and Zyprexa[36] were increased because Bethel claimed he had "racing thoughts at night." (Doc. 23-4 at 106-07). A prescription for injectable Lovenox was also added. *Id.* at 107. On August 30, 2017, Bethel submitted a request stating he thought Dr. Karas had indicated he would be getting 900 mg of Lithium at night, but he only got 600 mg. *Id.* at 109. Dr. Karas responded in writing that he had told Bethel he would increase the dosage from 300 mg at night to 600 mg. *Id.*

On September 6, 2017, Bethel asked for a second blanket because he was cold at night or to be allowed "medical sweat pants and a shirt." (Doc. 23-4 at 110). Bethel also asked for permission to give himself the Lovenox shots because medical staff were waking him up to administer them. *Id.* Further, Bethel told medical staff that the thought he should be prescribed Lasix and "heart-pills" from Cornerstone Pharmacy. *Id.* Finally, Bethel inquired about his CPAP machine. *Id.* Jail staff approved Bethel to use his CPAP machine at night if his family brought it in. *Id.* at 111. Bethel was not approved for the use of sweat pants, but a prescription was written for a second blanket. *Id.* An appointment was also scheduled with Dr. Fish, Bethel's heart doctor, for the first available appointment date—October 3, 2017. *Id.* at 113.

---

[36] Zyprexa is a brand name for the drug Olanzapine. "Olanzapine is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) in adults and teenagers 13 years of age and older. It is also used to treat bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods) in adults and teenagers 13 years of age and older." https://medlineplus.gov/druginfo/meds/a601213.html (accessed April 23, 2019).

On September 9, 2017, a notation was made in Bethel's medical chart that his family had brought his CPAP machine to the medical office at the WCDC. (Doc. 23-4 at 114). Another note indicated that Bethel would be housed in "medical holding" in order to use the CPAP machine nightly. *Id.* On September 11, 2017, Bethel complained that he was having "trouble getting medical to bring me down there at night to use CPAP/BIPAP while [I] sleep, also there is a problem with me getting blood thinner shot at nights, please let me know what changes will be made for me to receive correct medical care." *Id.* at 115. On September 12, 2017, a note was made in Bethel's chart indicating that his CPAP machine should be set to level 12, not level 8, and that Dr. Keylog at NWMC was his sleep doctor. *Id.* at 116. Medical staff were also advised that the CPAP machine had been set to level 8 by Homefront, the device's monitoring company, due to Bethel being "non-compliant." *Id.* Shortly thereafter, Homefront contacted the WCDC and advised that its agents needed to repossess the CPAP machine due to "non-compliance." *Id.* Indeed, on September 13, 2017, a Homefront representative arrived at the jail facility and removed the CPAP machine from the premises. *Id.* at 117.[37]

On September 16, 2017, Bethel submitted a request stating that he needed another drug along with his prescription for Lithium and suggested Haldol[38] and

---

[37] There is no allegation that Dr. Karas or Sheriff Helder was to blame for Homefront's decision to remove the CPAP machine from the jail.

[38] Haldol is a brand name for the medication Haloperidol. "Haloperidol is used to treat psychotic disorders (conditions that cause difficulty telling the difference between things or ideas that are real and things or ideas that are not real)." https://medlineplus.gov/druginfo/meds/a682180.html (accessed April 23, 2019).

Risperdal.[39] (Doc. 23-4 at 117).    He also noted that Zyprexa was not working well for him.  *Id.*  On September 19, 2017, Bethel's prescription for Zyprexa was discontinued, and he was put on Haldol (2 mg.).  *Id.* at 118, 142.  Bethel requested that his Haldol dosage be increased.  *Id.* at 119.  He was informed in writing that he had to wait for it to take full effect.  *Id.*

On September 24, 2017, Bethel complained of feeling chest pain, hearing voices in his head since his medication was changed, being worried that he would do something to hurt himself, and feeling a constant dull pain above his left nipple.  (Doc. 23-4 at 120); *see also* Doc. 23-5 at 2.[40]   Medical staff performed an EKG and checked Bethel's troponin[41] levels—both tests were negative and indicated that Bethel had not had a heart attack.  *Id.* at 120, 73-74.  Bethel was then placed on psych call and a 15-minute jail check from 12:00 p.m. on September 24th until 8:45 a.m. on September 25th.  *Id.* at 120, 87-88.   A notation was made in his medical file that he would remain on his current

---

[39] Risperdal is a brand name for the drug Risperidone.  "Risperidone is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) in adults and teenagers 13 years of age and older. It is also used to treat episodes of mania (frenzied, abnormally excited, or irritated mood) or mixed episodes (symptoms of mania and depression that happen together) in adults and in teenagers and children 10 years of age and older with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)." https://medlineplus.gov/druginfo/meds/a694015.html (accessed April 23, 2019).

[40] This is a September 27, 2017, incident report authored by Deputy Dillon Crouse. The report concerns Bethel's September 24, 2017, complaints of chest pain.

[41] Elevated troponin levels can be detected within hours of a myocardial injury. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1277047/ (accessed April 23, 2019).

medication until it had time to take full effect and that an adjustment could be considered after that. *Id.* at 120.

On September 26, 2017, Bethel asked for something for other than Haldol for depression. (Doc. 23-4 at 122). He specifically requested Risperdal and Celexa.[42] *Id.* On September 27, 2017, medical notes in Bethel's file reveal that he was prescribed 300 mg. of Lithium and that Haldol was discontinued. *Id.* On September 29, 2017, Risperdal 2 mg was added to Bethel's prescription list. *Id.* at 124.

On October 3, 2017, the WCDC brought Bethel to an appointment with Dr. Fish at the Walker Heart Institute, due to Bethel's history of hypertension and tricuspid insufficiency. (Doc. 23-4 at 81-85). Bethel was diagnosed with chest discomfort, shortness of breath, and hypertension. *Id.* at 84. Dr. Fish noted that Bethel needed a follow-up appointment with an echocardiogram. *Id.*

On October 4, 2017, Bethel complained to jail officials in a written grievance that he needed to stay warmer and that the blood thinner he was taking was making him cold. *Id.* at 127. He also indicated that he believed his dosage of Risperdal needed to be increased. *Id.* Bethel was seen by the nurse on October 5, 2017, and it was noted on his chart that he had some discoloration and swelling in his left lower extremity. *Id.* at 128. Bethel voiced concern that another DVT had formed in his leg. *Id.* Bethel was seen by Dr. Alan Spears the following day, and both D-dimer[43] and Lithium-level tests were

---

[42] Celexa is a brand name for the drug Citalopram. "Citalopram is used to treat depression."
https://medlineplus.gov/druginfo/meds/a699001.html (accessed April 26, 2019).

[43] An elevated D-dimer is usually found after a clot has formed and is the process of breaking down.

ordered. *Id.* at 130. On October 10, 2017, Bethel was advised by medical staff that his Lithium levels were within normal limits. *Id.* On October 13, 2017, Bethel was advised that the D-dimer test would not be performed because Dr. Karas concluded it was not needed at that time. *Id.* at 133.

On October 14, 2017, Bethel submitted a request stating he could not climb stairs or climb up to the top rack of his bunk because doing so put too much pressure on his leg. *Id.* at 134. On October 17, 2017, Dr. Karas ordered that Bethel be assigned a bottom bunk/floor restriction. *Id.* at 135, 142. Bethel testified that, despite the order in the file, he was never given a bottom bunk and was required to sleep on the floor. (Doc. 23-6 at 69). Bethel estimated he slept on the floor 60-70% of the time. *Id.* at 88-89.

Since Bethel was due to be transferred to the Arkansas Department of Correction ("ADC"), on October 16, 2017, WCDC staff submitted a health services request form directly to the ADC for the approval of an echocardiogram test for Bethel. (Doc. 23-4 at 86). In response, the ADC indicated that the October 3, 2017 visit to Dr. Fish—and the tests ordered by Dr. Fish—were the jail's responsibility. *Id.* It was also noted in Bethel's file that his transfer to the ADC would be expedited. *Id.* In the meantime, the jail was instructed by the ADC to "[t]reat emergencies as such." *Id.*

Bethel acknowledged in his deposition that Dr. Karas talked with him approximately five or six times about his medical issues while he was incarcerated at the WCDC. (Doc. 23-6 at 58). Bethel also talked with nurses in person and through grievances submitted via the electronic kiosk. He claims he made frequent complaints to

---

https://www.ncbi.nlm.nih.gov/books/NBK431064/ (accessed April 26, 2019).

obtain "blood thinner shots and at least an inhaler and updraft machine" to assist him with his breathing. *Id.* Bethel also testified that because he was not receiving all the medications at the WCDC that he had previously been prescribed in the free world, he suffered severe shortness of breath, difficulty walking, dizziness, feeling like he was being strangled at night, difficulty sleeping, and pain in his legs. *Id.* at 85.

On October 19, 2017, Bethel was transferred to the custody of the ADC. (Doc. 23-2 at 11). Bethel testified that the ADC restarted him on "all his medications," but he did not specify which ones he meant. (Doc. 23-6 at 85). Bethel indicated that not all of his medical conditions resolved while at the ADC, but he judges that "90 percent of them did." *Id.* In particular, he testified that his symptoms of shortness of breath, neuropathy in his extremities, and pain in his legs could never fully be cured, regardless of the medications he was prescribed. *Id.* at 86.

With respect to Bethel's claims against Sheriff Helder, Bethel testified that "Sheriff Helder was probably not advised of anything, nor did he make the effort to involve hi[m]self with any inmate that stayed there." *Id.* at 71. Bethel also conceded that he had no evidence that Sheriff Helder was even aware of his personal situation. *Id.* Ultimately, however, Bethel believes that Sheriff Helder is responsible for everything that happens in the jail and he should be held liable for that reason alone. *Id.* at 73-74.

With respect to Bethel's claims against Dr. Karas, Bethel testified that he personally told Dr. Karas about every medical condition he had, including his problems with walking and breathing. *Id.* at 76, 79. Despite this, Bethel complains that the longest amount of time Dr. Karas ever personally examined him was for approximately five minutes, and this was insufficient. *Id.* at 80. In Bethel's opinion, he should have been

given all the medications that he had been taking in the free world, prior to his incarceration at the WCDC, without restriction. *Id.* at 81.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In this case, the facts set forth by the Defendants are deemed admitted except to the extent they conflict with the verified complaint.  The question is whether, given the facts as admitted, any genuine issues of material fact remain as to whether Bethel's constitutional rights were violated.

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 577, 586 (2009) (internal quotation marks and citation omitted).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Defendants contend they are entitled to judgment as a matter of law for the following reasons:  there is no proof of any personal involvement on the part of Sheriff Helder in Bethel's medical care; Dr. Karas was not deliberately indifferent to Bethel's medical needs; negligence does not constitute a constitutional injury; Defendants are entitled to qualified immunity; and there is no basis for official-capacity liability.

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The Eighth Amendment deliberate-indifference standard applies to all denial-of-medical-care claims. *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012). The deliberate-indifference standard has both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 835, 834 (1994); *see also Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).

To prevail on his claims, Bethel must demonstrate that (1) he suffered an objectively serious medical need; and (2) each defendant actually knew of the medical need but, subjectively, was deliberately indifferent to it. *Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008) (internal quotation marks and citation omitted).

"Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotation marks and citation omitted). It may be shown "by prison doctors who fail to respond to prisoner's serious medical needs." *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999) (internal quotation marks and citation omitted).

The deliberate-indifference standard is not met by the exercise of professional judgment in refusing to implement an inmate's requested course of treatment. *Vaughn v.*

*Gray*, 557 F.3d 904, 908- 09 (8th Cir. 2009).   It requires a showing of more than negligence or medical malpractice.   *Roberson*, 198 F.3d at 647.

## A.  Sheriff Helder—Individual Capacity Claims

A supervisor becomes liable under § 1983 when he is personally involved in the alleged constitutional violation or "when the supervisor's corrective inaction constitutes deliberate indifference toward the violation.  The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he might see." *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) (internal quotation marks and citation omitted).   A supervisor is only liable for his own misdeeds and not for those of his agents under a theory of respondeat superior.  *Id.* (citations omitted).

Bethel has submitted no evidence that Sheriff Helder personally took any action that could be construed to amount to deliberate indifference to Bethel's serious medical needs.  Sheriff Helder was not involved in making any medical decisions regarding Bethel.  There is no evidence that Sheriff Helder even knew of the Bethel's medical conditions.  In fact, Bethel admits that Sheriff Helder had very limited contact with inmates and none with Bethel.   Sheriff Helder is entitled to summary judgment on the individual capacity claims against him.

## B.  Sheriff Helder and Dr. Karas—Official Capacity Claims

The official capacity claims against Sheriff Helder and Dr. Karas are the equivalent of claims asserted against Washington County.  *Veatch v. Bartels Lutheran Home*, 627 F.3d 125, 1257 (8th Cir. 2010).   There is nothing in the summary judgment record to suggest that any delay in providing Bethel his medications, obtaining his records, or otherwise failing to treat his conditions was attributable to a policy or custom of the County.  *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).  Without any such

evidence, the County may not be held liable. *Monell v. Dep't. of Soc. Svcs.*, 436 U.S. 658, 692-94 (1978); *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). Sheriff Helder and Dr. Karas are entitled to summary judgment in their favor on the official capacity claims.

## C. Dr. Karas—Individual Capacity Claims

This leaves Bethel's individual claims against Dr. Karas. The first interaction between Bethel and the medical staff at the jail was in connection with their attempt to verify his prescriptions and obtain his medical records. It does not appear that Dr. Karas was personally involved in the verification efforts. Further, it is reasonable to ensure a detainee has a valid, current prescription for the medication the detainee asserts he needs. The mere requirement that a prescription be verified before it can be given to a detainee cannot by itself constitute deliberate indifference.

However, a different question arises when the medications and serious medical conditions have been verified by medical staff, but the medications are not provided to the detainee afterward, within a reasonable period of time. "Prison authorities [may not] deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate to undue suffering or the threat of tangible residual injury." *Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 505 (M.D. Pa. 2017) (citation omitted). This is true because "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so those needs will not be met." *Estelle*, 429 U.S. at 103.

Dr. Karas in his affidavit details the efforts he and his staff made to obtain confirmation of Bethel's medical conditions and prescription medication. (Doc. 23-7 at 2-4). From the medical records Dr. Karas reviewed, it appeared to him that Bethel had last taken Lovenox—the medication used to prevent and treat blood clots—in the free world

in February of 2017, and Bethel received the medication again at the WCDC when he was incarcerated there for a brief stint between March 10 and March 14, 2017. *Id.* at 4. After reviewing these records, Dr. Karas requested further justification and details from Bethel's doctors before prescribing Lovenox. Then Dr. Karas performed a physical examination of Bethel and came to his own determination as to whether Lovenox was appropriate to prescribe. In the meantime, Dr. Karas ordered Bethel to take aspirin (an anticoagulant) and directed nurses to monitor him closely. Ultimately, Dr. Karas ordered that Bethel begin receiving Lovenox injections on August 29, 2017. *Id.* at 4. Dr. Karas pointed out in his affidavit that many of the prescriptions Bethel had previously been prescribed in the free world had not been filled since 2016. *Id.* at 3. Moreover, certain conditions these medicines were designed to treat never presented themselves at the time Bethel was incarcerated at the WCDC, beginning in July of 2017. For example, Bethel was never prescribed blood pressure medication at the WCDC because his blood pressure was routinely monitored and was always within normal limits.

The Court agrees with Dr. Karas's observation that there is "no medical evidence of any injury or damage caused by not providing Plaintiff the exact medication he was taking prior to prior to being incarcerated in the [WCDC] or of him not using his CPAP machine nightly." *Id.* at 5. In Dr. Karas's medical opinion, Bethel "did not present with any medical emergencies and his symptoms were adequately addressed with common medications and treatments." *Id.* Accordingly, there is no genuine, material dispute of fact as to whether Dr. Karas was deliberately indifferent to Bethel's medical needs. As the Eighth Circuit has explained, a "plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Greene Cnty. Jail Emps.,* 487

F.3d 1115, 1118 (8th Cir. 2007). Here, the facts show that Dr. Karas and his staff promptly requested Bethel's voluminous medical records from his free-world doctors and pharmacies, and these records were then promptly and critically reviewed. The medical record itself confirms that Bethel was prescribed several dozen different medications by multiple doctors over the course of several years—and many of these prescriptions had not been filled by Bethal for a year or more. Refusing to blindly prescribe all of these medications without adequate explanation or justification—particularly in light of the fact that Bethel had not filled many of these prescriptions for the past year—was perfectly reasonable under the circumstances.

Further, the record confirms that Dr. Karas ordered multiple tests to be performed on Bethel and arranged for him to be evaluated by a heart specialist, as well. In the Court's view, Bethel's disagreement with Dr. Karas has less to do with deliberate indifference and more to do with a difference of opinion over which medications—or, rather, *how many* medications—should have been prescribed. The Eighth Circuit has held that "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." *Dulany v. Carnahan,* 132 F.3d 1234, 1240 (8th Cir. 1997). Bethel's requests for medical treatment were never ignored; indeed, every request he submitted on the kiosk was answered. Certainly, physicians like Dr. Karas are free to exercise their independent medical judgment and may disagree with a patient—or even with other doctors—about the correct course of treatment. See *Taylor v. Bowers,* 966 F.2d 417, 421 (8th Cir. 1992) ("[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a

constitutional violation."); *Dulany,* 132 F.3d at 1239 ("[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment.").

For all of these reasons, the Court concludes that there is no triable issue of fact regarding whether Dr. Karas was deliberately indifferent to any of Bethel's serious medical needs, and the claims against Dr. Karas will be dismissed with prejudice.

### D. Qualified Immunity

As the Court has determined that no constitutional violation occurred, there is no need to proceed with the qualified-immunity analysis. *See Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (finding that if an official did not deprive a plaintiff of a constitutional or statutory right, the plaintiff "does not need qualified immunity, as he is not liable under § 1983").

### IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. 21) is **GRANTED**. All claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this 26th day of June, 2019.

/s/ Timothy L. Brooks_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE